IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
IN ADMIRALTY

JUDGE RAKOFF

------------------------------------------------x

DAVID ALLAUN,

                              Plaintiff,

          v.

FRED OLSEN CRUISE LINES,
MILES MORGAN TRAVEL, and
CAPTAIN ROBERT BAMBERG,

                              Defendants.

------------------------------------------------x

**13 CV 2504**

Index No.

**Seaman's Verified Complaint**

*Jury Trial Requested*

Plaintiff, David Allaun, sues Defendants, FRED OLSEN CRUISE LINES,

MILES MORGAN TRAVEL, and CAPTAIN ROBERT BAMBERG, and alleges:

    1.      This is a case of admiralty and maritime jurisdiction and a cause of action

within the scope of Rule 9(h), arising under the Jones Act, 46 U.S.C. § 688, 46 USC §

2114, the general Maritime Law of the United States, New York Labor Law § 744, and

the common law of the State of New York.

    2.      The Plaintiff, DAVID ALLAUN, is a seaman.

    3.      Pursuant to 28 USC § 1916, the filing fee is postponed.

## II.   Introduction

    4.      The Plaintiff is a medical doctor with years of experience acting as a

Ship's Doctor on the high seas.  The events narrated herein took place on board the m.v.

Balmoral, owned and operated by Defendant FRED OLSEN CRUISE LINES, in April of

2012.  The m.v. Balmoral was on "The Titanic Memorial Cruise," recreating the voyage

of the RMS Titanic one hundred years to the day and hour of the Titanic's fateful and

disastrous voyage.  On or about 10 April 2012, while on the high seas between Southampton and New York, the Plaintiff was presented with a patient who was suffering from an acute cardiac condition that required urgent treatment in a land-based hospital.

5.      When apprised of the situation, Defendant CAPTAIN ROBERT BAMBERG refused to divert course to bring the ship within helicopter range of land in order to save the patient's life.  Instead, Captain Bamberg wished to maintain course in order to reach the location where the RMS Titanic sank at the precise day and hour the Titanic sank there.  Like the Titanic, which failed to slow down in ice-filled waters in order to set a speed record on its voyage, the Defendants risked human life for a matter of mere scheduling.  The Plaintiff took steps which alerted decision-makers on shore, the Captain's orders were countermanded, and the ship diverted to save the passenger's life.

6.      Rather than receiving thanks, the Plaintiff received scorn and humiliation from the Defendants throughout the voyage.  Finally, while docked in New York, the Defendants placed guards at the gangplank to prevent the Plaintiff from leaving the ship, making him prisoner.  The Defendants subsequently forced the Plaintiff to resign.

7.      The Plaintiff now seeks relief under the admiralty and pendent jurisdiction of this Court, asserting claims for False Imprisonment, Unseaworthiness, the Jones Act, and New York Labor Law § 740.

## III.    Jurisdiction and Venue

8.      This Court has jurisdiction pursuant to 28 USCS § 1333, as the claims arise in whole or in part within admiralty jurisdiction.

9.      This Court has jurisdiction over the Plaintiff's state-law claims pursuant to 28 USCS §§ 1333 & 1367.

10.     Venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## IV.    The Parties

11.     Plaintiff David Allaun is a natural person residing in Cheshire, Great Britain.

12.     Fred Olsen Cruise Lines Ltd. is a foreign corporation with its principal place of business at White House Road, Ipswich, Suffolk, IP1 5LL, United Kingdom. The Registered Office is located at 64-65 Vincent Square, London SW1P 2NU, 2nd Floor.  Upon information and belief, Fred Olsen Cruise Lines Ltd. is the owner of the ship m.v. Balmoral.

13.     MILES MORGAN TRAVEL is a foreign corporation with its principal place of business at 2a The Precinct, Portishead, Bristol BS20 6AH, United Kingdom. Upon information and belief, at all relevant times, MILES MORGAN TRAVEL was the leaseholder of the ship m.v. Balmoral.

14.     Captain Robert Bamberg is a natural person residing, upon information and belief, in Finland.

15.     The Plaintiff is a physician: he was born in October 1943.  He qualified in Manchester, England in 1967.  He has an unusually broad medical experience and was well qualified to work on board passenger liners. Since May 2006, in this capacity, as a ship's doctor, he had been employed by Fred Olsen Cruise Lines on their vessels: Black Prince, Black Watch, Braemar, Boudicca, and Balmoral.

## V.   Statement of Facts

### A.   The Plaintiff Joins the Crew of the Defendant's "Titanic Memorial Cruise" as Ship's Doctor

16.     The Plaintiff joined the crew of the m.v. Balmoral for a voyage scheduled to extend from April 8, 2012 until April 29, 2012.

17.     In April 2012, the flagship of the line, Balmoral, was chartered for "The Titanic Memorial Cruise," in which the ship would repeat the famous voyage of the original Titanic, exactly 100 years later, leaving the same port of departure (Southampton) stopping at the same port of call (Cobh, Ireland) and having a memorial service at exactly the spot in the North Atlantic Ocean that the famous ship sank, at exactly the same time of night, exactly 100 years later. Exactly the same number of passengers, 1309, were allowed to book on the cruise and it was sold out more than a year before it was due to take place. It promised to be an unusual event and the Plaintiff was enthusiastic to be the doctor, particularly as Fred Olsen Cruise Lines do not routinely visit New York, and this was on the itinerary.

18.     The Plaintiff's position on the crew was Ship's Doctor.

19.     Plaintiff and Fred Olsen Cruise Lines Ltd. entered into an Instructions and Service Agreement (the "Agreement") for the voyage.

20.     The first paragraph of the Agreement defined the duties of the position:

The Doctor is to care for and treat sick and injured passengers and crew, and if necessary admit them to the ship's Medical Centre. If necessary, the patient should be evacuated to a shore-based hospital.

21.     The Agreement also provided that:

In professional, purely medical questions, the Doctor must make his/her decisions alone.

22.     The Agreement also provided that:

4

When the ship is in port ... **one or the other** of the two Doctors on board, or the Nursing Sister, must remain on board in case of emergency.  The doctor's duties are to be shared equally in case of emergency.

23.     The Agreement was duly executed by the Plaintiff, and by Anna Storey, Medical Administrator for Fred Olsen Cruise Lines Ltd.

24.     The Plaintiff was one of two Ship's Doctors on board.

25.     The other Ship's Doctor was Dr. Sandy Carss, a consultant in Accident & Emergency surgery.

**B.      The "Titanic Memorial Cruise" Sets Sail on the m.v. Balmoral**

26.     The Plaintiff joined the vessel in Southampton on 8 April 2012. It was here that they discovered that the Captain for the Titanic Memorial cruise was to be Robert Bamberg, a citizen of Finland.

27.     Balmoral reached Cobh, in Ireland, late in the afternoon on the 9th of April 2012, exactly as Titanic had done. Later that night, the ship departed from Cobh to retrace the ill-fated journey.

28.     The "Titanic Memorial Cruise" was scheduled to stop mid-sea at the location where the RMS Titanic sank in the early morning hours of April 15, 1912, 375 miles (600 km) south of Newfoundland, in order to conduct a 'memorial service.'  The Balmoral scheduled its arrival at that location to one hundred years to the hour from the date and time the passengers of the Titanic died.

29.     The Balmoral would then proceed to the destinations never reached by the Titanic: Halifax, Nova Scotia, and New York.

**C.**   **The Plaintiff Treats a Passenger's Grave and Life-Threatening Illness**

30.     The following morning, the 10th of April at around 9.45 hours, a male passenger presented to the Plaintiff in a state of heart failure.  At the time of presentment, the patient's condition was worsening and deteriorating.  The Plaintiff's examination of the patient showed, among other signs, a grossly abnormal electrocardiograph (EKG) exhibiting gross fibrillation of the heart.  The patient also had a serious mitral valce defect.  At this point, the Plaintiff engaged in remote consultation with cardiac specialists on land.

31.     Together, the Plaintiff and these specialists determined that the patient likely would not survive without treatment in a full-fledged hospital, and might well die before the ship reached its next port of call, Halifax, Nova Scotia, six days later.  The Plaintiff and his land-based colleagues reached this medical consensus at approximately 1:00 PM on April 10th.

**D.**   **Captain Bamberg Refuses to Change Course to Save The Passenger's Life**

32.     The Plaintiff immediately informed the Captain of the passenger's dire situation.  The Captain stated that the ship was outside helicopter range of the nearest coast (Ireland).  The Captain stated that while he could turn the ship around to get within helicopter range in a matter of hours, if he did this it would "upset [his] cruise," suggesting that the ship might not be on time when it reached the site of the Memorial. The Captain stated he simply would not consider turning back.

33.     "The Titanic Memorial Cruise" began to bear a frightening resemblance to the original Titanic's voyage.  In 1912, the Titanic ignored imminent risk to human life in order to maintain its schedule, travelling at full speed through ice floes until it met its

6

doom. In 2012, "The Titanic Memorial Cruise," its Captain, and Fred Olsen Cruise Lines decided to play dice with a dying man's life in order to maintain its own schedule.

34.     Most ghoulish of all, the destination the Captain and Fred Olsen Cruise Lines were so concerned with reaching on time was the site of the mass death of innocent passengers killed by the White Star Line's hubris in 1912. Reaching that spot a few hours past an exact hundred years since those screaming passengers slipped beneath the icy waves was too high a price to pay in order to save the life of a living breathing man on board the "tribute" ship. On this voyage of "The Titanic Memorial Cruise," instead of tribute, there was to be human sacrifice.

### E.     The Plaintiff and Medical Staff Take Steps to Save the Dying Patient, and the Captain's Orders Are Countermanded

35.     Dr. Carss called Dr. Richard Gill, the land-based Company Doctor for Fred Olsen Cruise Lines. Dr. Gill said that he would try to speak to a cardiologist about the situation.

36.     Upon information and belief, Dr. Gill caused the Captain's determination not to turn the ship around to be countermanded. However, the medical team (including the Plaintiff), and the patient were not informed.

37.     The patient's treatment was continued on a basis that would maximize his chances of surviving to Halifax. This treatment differed from the treatment that would have been given had it been known that the patient would be transferred to a land-based hospital much sooner, in ways that created unnecessary medical risks for the patient.

38.     The patient himself was not informed that Fred Olsen Cruise Lines had changed its mind, and decided to take the proper measures to save his life. He continued in uncertainty and distress.

39.     The Captain ignored the medical team's requests for information.  The medical team learned that the ship would indeed turn back to get within range of the Irish coast only when the ship announced the course change to the entire ship via the public address system.

40.     At some time on the evening of the 10th of April, a helicopter met the ship and the sick passenger was winched away to safety in Ireland. Because of the ship's needless maneuvers, his admission to hospital had been delayed by many hours.

41.     Once on the mainland, the patient's condition was stabilized in a hospital. A few days later, the patient underwent life-saving heart surgery.  Because of the actions of the Plaintiff and the other members of the medical team aboard the m.v. Balmoral, the patient is alive today.

42.     "The Titanic Memorial Cruise" was a high-profile cruise which was closely watched by the media. The helicopter evacuation was seen on televisions all over the world; the Captain and Fred Olsen Cruise Lines reveled in the good publicity that the rescue had generated.

43.     At no time did Fred Olsen Cruise Lines inform the press that its Captain had risked killing a passenger in order to reach the death site of the Titanic on the precise death anniversary.

**F.     The Captain and Fred Olsen Cruise Lines Retaliate
        Against the Plaintiff By Imprisoning Him on the Ship**

44.     Upon information and belief, the Captain determined that he would exact his own revenge on the Plaintiff for having challenged the Captain in order to save a life. However, this became clear upon arrival in New York on April 19, 2012.

45.     On the morning of the April 19, 2012, the Balmoral docked in New York.

46. The medical staff had arranged among themselves, as was customary for a ship, to coordinate their disembarkation and time ashore so that the medical facility would be properly staffed at all times.

47. The Plaintiff was scheduled to go ashore on the morning of April 19, 2012.

48. However, an order was issued that the Plaintiff was not to be permitted to leave the ship.

49. When the Plaintiff tried to disembark, the guards at the gangplank told him he was not permitted to leave the ship.

50. The guards, who were trained military personnel, told the Plaintiff that they were preventing him leaving on the instructions of the Chief Officer.

51. The Plaintiff understood the response of the guards to his request to leave as communicating that he would be prevented by physical force from leaving the ship if he attempted to do so.

52. The Plaintiff was a 68 year old physician. Though fit, at 145 lbs., years old, he was no match for a squad of young, military-trained, security guards. The Plaintiff was a prisoner on the ship.

53. After the Plaintiff was forbidden to leave, Angela Arnold, Port Operations Manager for Fred Olsen Cruise Lines, arrived on board the ship. The Plaintiff told her that he was being forbidden to leave the ship.

54. The Plaintiff attempted to leave the ship a second time.

55. Again, the security guards told him he would not be permitted to leave this ship.

56.     The Plaintiff was maintained prisoner on the ship for several hours.

57.     During this period of time, the Plaintiff had previously scheduled and paid for activities on shore, and the Plaintiff missed those activities. The Plaintiff accordingly suffered pecuniary loss. Moreover, the Plaintiff was forcibly separated from his wife for the duration of his imprisonment. The Plaintiff's wife had been made to leave the ship; she was not informed that the Plaintiff was being detained, and she was prevented from returning to investigate when he did not show up.

58.     Finally, the Plaintiff made a third attempt to leave the ship. This time, the guards allowed him to pass.

## G.     Fred Olsen Lines Takes Further Retaliatory Steps Against the Plaintiff

59.     Throughout the remainder of the voyage, the Captain and senior crew went out of their way to show disrespect to the Plaintiff, as well as to Dr. Carss and the rest of the medical team.

60.     Fred Olsen Cruise Lines failed to properly investigate the conduct of the Captain in detaining the Plaintiff against his wishes.

61.     Rather, Fred Olsen Cruise Lines endorsed the actions of the Captain and indicated to the Plaintiff that if he wished to continue to work for Fred Olsen Cruise Lines, he would be required to admit that the Captain's false imprisonment of the Plaintiff had been a proper exercise of authority.

62.     In so doing, Fred Olsen Cruise Lines made clear that its primary goal was to avoid potential liability arising out of the incidents, including liability to the Plaintiff.

63.     Fred Olsen Cruise Lines improperly conditioned the Plaintiff's continued employment upon the Plaintiff's relinquishment of his rights to seek relief and

compensation against Fred Olsen Cruise Lines and against Captain Bamberg and other responsible crewmembers.  Fred Olsen Cruise Lines, which avoided much more serious liability for wrongful death as a result of the Plaintiff's actions, offered no compensation to the Plaintiff for the relinquishment of these rights.

64.     Instead, Fred Olsen Cruise Lines created such an inhospitable and hostile environment that the Plaintiff felt he had no choice but to resign.  The Plaintiff did not want to resign, and would not have considered resignation but for the hostility of Fred Olsen Cruise Lines, Captain Bamberg, and other Fred Olsen Cruise Lines employees.

## I.     FALSE IMPRISONMENT AGAINST FRED OLSEN CRUISE LINES AND MILES MORGAN TRAVEL

65.     The Plaintiff repeats and realleges the foregoing.

66.     Fred Olsen Cruise Lines and Miles Morgan Travel intended to, and did, confine the Plaintiff on board the m.v. Balmoral.

67.     The Plaintiff was conscious of the confinement.

68.     The Plaintiff did not consent to the confinement.

69.     The confinement was not otherwise privileged.

70.     As a result, the Plaintiff suffered confinement, emotional distress, pecuniary loss, and loss of wages, benefits of privileges of employment.

71.     Accordingly, the Plaintiff seeks damages in an amount to be determined at trial.

## II.     FALSE IMPRISONMENT AGAINST CAPTAIN ROBERT BAMBERG

72.     The Plaintiff repeats and realleges the foregoing.

73.     Captain Robert Bamberg intended to, and did, confine the Plaintiff on board the m.v. Blmoral.

11

74.     The Plaintiff was conscious of the confinement.

75.     The Plaintiff did not consent to the confinement.

76.     The confinement was not otherwise privileged.

77.     As a result, the Plaintiff suffered confinement, emotional distress, pecuniary loss, and loss of wages, benefits of privileges of employment.

78.     Accordingly, the Plaintiff seeks damages in an amount to be determined at trial.

### III.   GENERAL MARITIME LAW: UNSEAWORTHINESS

79.     The Plaintiff repeats and realleges the foregoing.

80.     A vessel owner has a fundamental duty to provide its crew members with a reasonably safe vessel.

81.     This duty includes the duty to provide a vessel staffed with crew who are competent and who are trained to properly perform their duties in compliance with the law.

82.     Fred Olsen Cruise Lines and Miles Morgan Travel breached that duty by staffing the vessel with seaman such as Captain Bamberg, the Chief Officer, and the armed guards at the gangplank.

83.     The employees were improperly instructed and trained, and as a consequence threatened the Plaintiff with violence and subjected him to unlawful imprisonment.

84.     As a result, the Plaintiff suffered confinement, emotional distress, pecuniary loss, and loss of wages, benefits of privileges of employment.

85. Accordingly, the Plaintiff seeks damages in an amount to be determined at trial.

## IV. GENERAL MARITIME LAW: UNSEAWORTHINESS

86. The Plaintiff repeats and realleges the foregoing.

87. A vessel owner has a fundamental duty to provide its crew members with a reasonably safe means of boarding and departing from the vessel.

88. Fred Olsen Cruise Lines and Miles Morgan Travel breached that duty by placing armed guards at the gangplank for the purpose of preventing the Plaintiff's departure from the vessel by violent means.

89. As a result, the Plaintiff suffered confinement, emotional distress, pecuniary loss, and loss of wages, benefits of privileges of employment.

90. Accordingly, the Plaintiff seeks damages in an amount to be determined at trial.

## V. THE JONES ACT

91. The Plaintiff repeats and realleges the foregoing.

92. The Plaintiff was a seaman under the meaning of the Jones Act.

93. The Plaintiff was subjected to false imprisonment and threat of violence by Fred Olsen Cruise Lines and Miles Morgan Travel while performing his duties as a seaman.

94. As a result, the Plaintiff suffered confinement, emotional distress, pecuniary loss, and loss of wages, benefits of privileges of employment.

95. Accordingly, the Plaintiff seeks damages in an amount to be determined at trial.

## VI.   Unlawful Retaliation Under 46 USC § 2114

96.   The Plaintiff repeats and realleges the foregoing.

97.   The Defendant Fred Olsen Cruise Lines discharged the Plaintiff because the seaman has refused to perform duties ordered by the seaman's employer because the seaman has a reasonable apprehension or expectation that performing such duties would result in serious injury to the seaman, other seamen, or the public.

98.   As a result, the Plaintiff suffered confinement, emotional distress, pecuniary loss, and loss of wages, benefits of privileges of employment.

99.   Accordingly, the Plaintiff seeks damages in an amount to be determined at trial.

## VII.   New York State Labor Law § 740

100.   The Plaintiff repeats and realleges the foregoing.

101.   At all relevant times, Plaintiff was an individual who performed services for and under the control and direction of Fred Olsen Cruise Lines for wages or other remuneration.

102.   At all relevant times, Fred Olsen Cruise Lines was a person, firm, partnership, institution, corporation, or association that employs one or more employees.

103.   Plaintiff disclosed, or threatened to disclose to a supervisor or to a public body an activity, policy or practice of Fred Olsen Cruise Lines that was in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety.

104.   By refusing to aid the dying passenger, Fred Olsen Cruise Lines violated the general maritime law and the law of admiralty applicable in international waters, as described in Hunley v. ACE Maritime Corp., 927 F.2d 493, 498 (9th Cir. Or. 1991).

105.   By failing to aid the dying passenger, Fred Olsen Cruise Lines violated "the universal custom of the sea," recognized in admiralty law, that "a ship shall use every reasonable means to save the life of a human being who has no other source of help," as stated in <u>Gardner v. National Bulk Carriers, Inc.</u>, 310 F.2d 284, 286 (4th Cir. Va. 1962).

106.   The actions of Fred Olsen Cruise Lines placed that passenger at risk of death.

107.   Fred Olsen Cruise Lines retaliated against Plaintiff by means of his discharge, suspension or demotion, and other adverse employment action taken against Plaintiff in the terms and conditions of employment.

108.   The retaliatory action occurred, in part, in New York County.

109.   The Plaintiff accordingly seeks:

    a.    the reinstatement to the same position held before the retaliatory personnel action, or to an equivalent position;
    b.    reinstatement of full fringe benefits and seniority rights;
    c.    compensation for lost wages, benefits and other remuneration; and
    d.    the payment by Fred Olsen Cruise Lines of reasonable costs, disbursements, and attorney's fees.

## VIII.   PUNITIVE DAMAGES

110.   The Plaintiff repeats and realleges the foregoing.

111.   The conduct of Defendant Fred Olsen Cruise Lines and Miles Morgan Travel was egregious and intentional.

112.   Therefore, for each of the foregoing causes of action, the Plaintiff demands punitive damages to the full extent permitted by law.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

a.  Invoke pendent party and pendent claim jurisdiction.
b.  Award appropriate compensatory and punitive damages.
c.  Empanel a jury.
d.  Award attorney's fees and costs.
e.  Award such other and further relief as the Court deems to be in the interest of justice.


DATED:     New York, New York
           April 15, 2013

                              Respectfully submitted,


                              DAVID A. THOMPSON [DT3991]
                              STECKLOW, COHEN & THOMPSON
                              10 Spring Street Suite 1
                              New York, New York 10012
                              PHONE:      (212) 566-8000
                              FAX:        (212) 202-4952
                              ATTORNEYS FOR PLAINTIFF

16

## **VERIFICATION**

STATE OF NEW YORK      )
                       )
COUNTY OF NEW YORK  )

     This 15th day of April personally appeared before me, the undersigned, David A. Thompson, attorney for the Plaintiff, David Allaun, who after being first duly sworn, deposes and says as follows:

1. I am the attorney for the Plaintiff in the above-styled case and I have read the complaint herein.
2. The Plaintiff is not at the present time present in this District to verify the complaint.
3. To the best of my knowledge and belief, the matters allege in this Complaint are true, and as to those matters alleged to be upon information and belief, I believe them to be true.
4. That the source of my knowledge and belief is personal knowledge with the reports and business records obtained from the parties herein.

BY: _David A. Thompson_

David A. Thompson, Esq. [dt3991]
Stecklow Cohen & Thompson
10 Spring Street, Suite 1
New York, N.Y. 10012
Phone: (212) 566-8000

_____
NOTARY PUBLIC

SAMUEL COHEN
NOTARY PUBLIC - STATE OF NEW YORK
NO. 01CO6108536  Kings
QUALIFIED IN ~~NEW YORK~~ COUNTY
COMMISSION EXPIRES ~~07/02/2012~~
10/5/2016

17